UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SUSAN WEINSTEIN, individually, as co-administrator of the Estate of Ira William Weinstein, and as natural guardian of plaintiff David Weinstein, JEFFREY A. MILLER as co-administrator of the Estate of Ira William Weinstein, JOSEPH WEINSTEIN, JENNIFER WEINSTEIN HAZI, and DAVID WEINSTEIN,

Plaintiffs-Judgment Creditors,

-against-

Case No.: Misc. 02 237

THE ISLAMIC REPUBLIC OF IRAN, THE IRANIAN MINISTRY OF INFORMATION AND SECURITY, AYATOLLAH ALI HOSEINI KHAMENEI, ALI AKBAR HASHEMI-RAFSANJANI, and ALI FALLAHIAN-KHUZESTANI,

Defendants-Judgment Debtors.
-------------------------------------------------------------------X

**PLAINTIFF – JUDGMENT CREDITOR'S MEMORANDUM IN OPPOSITION TO BANK MELLI'S MOTION TO DISMISS AND REPLY IN FURTHER SUPPORT OF MOTION FOR APPOINTMENT OF A RECEIVER PURSUANT TO CPLR § 5228(a)**


**JAROSLAWICZ & JAROS, LLC**
*Attorneys for the Plaintiffs*
225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

**PLAINTIFF – JUDGMENT CREDITOR'S MEMORANDUM IN OPPOSITION TO BANK MELLI'S MOTION TO DISMISS AND REPLY IN FURTHER SUPPORT OF MOTION FOR APPOINTMENT OF A RECEIVER PURSUANT TO CPLR § 5228(a)**

## Introduction

Currently pending before the Court is plaintiff/judgment creditor's ("plaintiff") motion for appointment of a receiver pursuant to CPLR § 5228(a) authorized to sell Bank Melli's property in satisfaction of the underlying judgment in this action ("Receiver Motion").

Rather than file an **opposition** to the Receiver Motion, Bank Melli has moved "to dismiss the proceeding" and to stay the Receiver Motion pending resolution of the motion to dismiss. Bank Melli's Memorandum of Law ("Melli Memo") at 1.

Bank Melli's "motion to dismiss" is a procedural *non sequitur*. Neither the Federal Rules nor the CPLR permit **dismissal** of either the underlying judgment or the Receiver Motion. Moreover, there are not both a "proceeding" **and** a "motion" pending here – the sole "proceeding" is the Receiver Motion itself. The manner in which Bank Melli has framed its relief therefore simply makes no sense.

It appears that Bank Melli has proceeded in this fashion in order to lay the groundwork to launch a whole new round of briefing once its "motion to dismiss" is disposed of. This is not speculation: in another pending proceeding to enforce a terrorism judgment against Iran, a federal court in Chicago found that Iran (represented by the same counsel as the bank) was engaging in exactly this type of redundant motion practice. *See Rubin v. Islamic Republic of Iran,* at * 20 2008 WL 192321 (N.D.Ill. 2008) (noting that "it has been nearly five years since this case began and eighteen months since Iran entered the proceeding, yet the litigation is still at the discovery stage" and prohibiting Iran from filing further discovery objections without leave of the court.).

We respectfully request that the Court not be drawn into the procedural morass that Bank Melli is seeking to create in order to guarantee itself undeserved further bites at the apple. As shown below, Bank Melli has proffered no grounds whatsoever to deny (or "dismiss") the Receiver Motion. Therefore, the bank's motion should be denied, and the Receiver Motion should be granted forthwith.

## ARGUMENT

### I. TRIA § 201 IS A STATUTORY REVERSE VEIL–PIERCING PROVISION

Bank Melli does not dispute that under § 201 of the Terrorism Risk Insurance Act ("TRIA") the underlying judgment may be satisfied from Bank Melli's Forest Hills property. The bank thus concedes that the **statutory requirements of TRIA** are met here.

However, Bank Melli argues that granting that relief will place the United States in breach of two treaties with Iran, the Treaty of Amity, Economic Relations, and Consular Rights, 8 U.S.T. 899 (1955) ("Treaty of Amity") and the Algiers Accords, reprinted in 20 1.L.M. 223 (1981).

As will be shown below, the relief sought here would in no way violate these treaties. However, before discussing **why** this is so – *i.e.* before proceeding to a refutation of the specifics of Bank Melli's arguments – a discussion of the background, purpose and function of § 201 of TRIA is in order.

**A. Why TRIA Was Enacted**

Plaintiffs' underlying judgment was entered under a 1996 amendment to the Foreign Sovereign Immunities Act ("FSIA"), codified at 28 U.S.C. § 1605(a)(7), which was designed to permit U.S. citizens and their families to bring civil actions against foreign state sponsors of terrorism such as Iran. "In light of the mounting Congressional frustration at the inability of United States victims of foreign state abuses to obtain relief from any forum … Congress enacted 28 U.S.C. § 1605(a)(7) to ensure fair play and substantial justice for American victims of state sponsored terrorism." *Flatow v. Islamic Republic of Iran.* 999 F.Supp. 1 (D.D.C. 1998).

The vast majority of judgments given under § 1605(a)(7) of the FSIA, both prior and since the enactment of TRIA in 2002, have been against Iran, in favor of American citizens who, like the instant plaintiffs' decedent, were murdered, tortured or held hostage by Iranian-funded and Iranian-trained Islamic terrorist groups such as Hamas, Hizballah and the Islamic Jihad. *See, e.g. Flatow*, 999 F.Supp. 1 (Iran liable for death of American student in Islamic Jihad bombing); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001) (Iran liable for kidnap and torture of American by Hizballah); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000) (Iran liable for death of American students in Hamas bombing); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001) (Iran liable for kidnap and torture of American priest by Hizballah); *Anderson v. The Islamic Republic of Iran*, 90 F. Supp. 107 (D.D.C. 2000) (Iran liable for kidnap and torture of American journalist by Hizballah); *Cicippio v. The Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998) (Iran liable for kidnap and torture of American academics and businessmen by Hizballah).

Unfortunately, however, the many American victims of Iranian-sponsored terrorism were unable to enforce their judgments (until the passage of TRIA) because Iran conducts business

and maintains property in the United States using state-owned corporations, and other agencies and instrumentalities of the Iranian government with separate legal personality. Under the standard set forth in *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 629 (1983) ("*Bancec*") and its progeny, in order to "pierce the corporate veil" distinguishing a foreign state from its agencies and instrumentalities, a judgment-holders had to show that the agency or instrumentality is "so extensively controlled by [the foreign state] that a relationship of principal and agent is created" or that recognizing the entity as separate "would work fraud or injustice." The *Bancec* standard proved difficult to meet. *See, e.g., Flatow v. Islamic Republic of Iran,* 308 F.3d 1065, 1069-73, 1073 (9th Cir. 2002) (finding that plaintiff could not overcome *Bancec* presumption that Iranian bank was separate from Iran, and thus could not execute on assets of Iranian bank to satisfy judgment against Iran); *Flatow v. Islamic Republic of Iran, et al*., 67 F. Supp. 2d 535, 543 (D.Md. 1999) (same) *aff'd* 225 F.3d 653 (4th Cir. 2000).

Thus, because most Iranian assets in the United States are held by Iranian government-owned corporations, until the passage of TRIA not a single American victim of Iranian-sponsored terrorism succeeded in executing against Iranian assets in satisfaction of a judgment against Iran under 28 U.S.C. § 1605(a)(7). Needless to say, Iran has refused to honor or pay these judgments, while unabashedly continuing to avail itself of the U.S. economy through its wholly-owned corporations. The glaring injustice of this state of affairs, and the need for a legislative remedy, was expressly noted by the U.S. District Court for the District of Columbia:

> [T]he Court regrets that plaintiff's efforts to satisfy his judgment against Iran have proven futile. Indeed, in light of his lack of success thus far, it appears that plaintiff Flatow's original judgment against Iran has come to epitomize the phrase "Pyrrhic victory." Yet, **unless or until Congress decides to enact a law that authorizes the**

> **attachments plaintiff seeks**, this Court lacks the proper means to assist him with such endeavors.

*Flatow v. Iran* 76 F. Supp. 2d 16, 27-28 (D.D.C. 1999) (emphasis added).

### <u>B. TRIA's Function and Purpose</u>

In November 2002, Congress enacted TRIA § 201, thereby finally putting an end to the intolerable and unjust situation wherein Iran openly provides massive funding and training to terrorist groups which murder, torture and kidnap U.S. citizens and brazenly refuses to honor U.S. court judgments ordering Iran to compensate the victims, and yet at the same time freely conducts business and maintains property in the United States by hiding behind the corporate veil of its wholly-owned corporations.

A recent decision by another court in this Circuit thoroughly analyzed the function and purpose of TRIA:

> TRIA works to obviate analysis of the *Bancec* presumption. TRIA clearly provides that "in every case in which a person has obtained a judgment against a *terrorist party* on a claim ... for which a *terrorist party* is not immune under 28 U.S.C. § 1605(a)(7), the blocked assets of that terrorist party *(including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution...." TRIA § 201(a) (emphasis added). The first part of this passage refers to judgments against a "terrorist party" - not against an agency or instrumentality of the terrorist party. Yet the second part of this passage refers not only to the blocked assets of the terrorist party, but specifically includes the blocked assets of any "agency or instrumentality" of that terrorist party. TRIA thus explicitly provides that where a judgment against a terrorist party exists, not only its blocked assets, but the assets of its agencies and instrumentalities can be used to satisfy the judgment. The language of TRIA itself thus indicates that Congress intended to make the agencies or instrumentalities of statutorily defined terrorist parties liable for qualifying judgments rendered against the terrorist party in question. …

> The legislative history of TRIA also supports this interpretation. On the Senate floor, addressing the Senate in connection with the conference report accompanying TRIA, Senator Harkin, a sponsor of TRIA, stated:
>
>> I rise to address a portion of this conference agreement relating to enforcement of judgments obtained by victims of terrorism against state sponsors of terrorism....
>>
>> Title II expressly addresses three particular issues which have vexed victims of terrorism in this context. First, there has been a dispute over the availability of "agency and instrumentality" assets to satisfy judgments against a terrorist state itself. Let there be no doubt on this point. Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state, including the blocked assets of any of its agencies or instrumentalities, available for attachment and/or execution of a judgment issued against that terrorist state. *Thus, for purposes of enforcing a judgment against a terrorist state, title II does not recognize any juridical distinction between a terrorist state and its agencies or instrumentalities*.
>
> 148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of Sen. Harkin) (emphasis added).

*Weininger v. Castro*, 462 F.Supp.2d 457, 485-486 (S.D.N.Y. 2006).

Thus, § 201 of TRIA operates to pierce the corporate veil between foreign state sponsors of terrorism and their agencies and instrumentalities, and to render the latter liable for judgments entered against the former.

In other words, TRIA is simply a statutory reverse veil-piercing provision. *See, generally*, 1 Fletcher Cyc. Corp. § 41.70. Bearing that in mind, we now proceed to Bank Melli's arguments.

## II. GRANTING THE RELIEF SOUGHT WOULD NOT VIOLATE ARTICLE III(1) OF THE TREATY OF AMITY

Bank Melli argues that permitting enforcement of the underlying judgment against its property pursuant to § 201 of TRIA would violate Article III(1) of the Treaty of Amity. Melli Memo at 15. Article III(1) of the Treaty provides that:

> Companies constituted under the applicable laws and regulations of either High Contracting Party shall have their juridical status recognized within the territories of the other High Contracting Party. It is understood, however, that recognition of juridical status does not of itself confer rights upon companies to engage in the activities for which they are organized. As used in the present Treaty, "companies" means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit.

Treaty of Amity, III(1).

According to Bank Melli, Article III(1) requires United States to "respect the separate juridical status of Iranian companies" and therefore prohibits this Court from applying the statutory veil-piercing mechanism provided by TRIA § 201 to its property. Melli Memo at 15.

Simply put, Bank Melli is claiming that Article III(1) bars the courts of the United States from ***ever*** piercing the corporate veil of ***any*** company which is "constituted under the applicable laws and regulations of" Iran.

This argument is not only meritless but frivolous, because it utterly misconstrues and misrepresents the purpose and function of Article III(1) of the Treaty of Amity. As the Bank points out, the Treaty of Amity between Iran and the United States "is one of approximately 20 friendship, commence, navigation ("FCN") treaties negotiated by the United States following WWII." Melli Memo at 3. Significantly, most if not all of these FNC treaties contain provisions substantively identical to Article III(1). *See e.g.* Japan - U.S. FNC Treaty, 4 U.S.T. 2063, T.I.A.S. No. 2863 (1953), Article XXII(3) ("Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall

have their juridical status recognized within the territories of the other Party."); Germany - U.S. FNC Treaty, 7 U.S.T. 1839, T.I.A.S. No. 3593 (1954), Article XXV(5) ("Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party."); Korea - U.S. FNC Treaty, 8 U.S.T. 2217, T.I.A.S. No. 3947 (1956), Article XXII(3) ("Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party."); Israel - U.S. FNC Treaty, 5 U.S.T. 550, T.I.A.S. No. 2948 (1951), Article XXII(3) ("Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party."); Greece - U.S. FNC Treaty, 5 U.S.T. 1829, T.I.A.S. No. 3057 (1951), Article XXIV(3) ("Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party."); France – U.S. Treaty, 11 U.S.T. 2398, T.I.A.S. No. 4625 (1959) Article XXIV(5) ("Companies constituted under the applicable laws and regulations within the territories of either High Contracting Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other High Contracting Party."); Netherlands – U.S. FNC Treaty, 8 U.S.T. 2043, T.I.A.S. No. 3942 (1956), Article XXIII(3) ("Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party."); Pakistan – U.S. FNC Treaty, 12 U.S.T. 110, T.I.A.S. No. 4683 (1959), Article XXI(3) ("Companies constituted under the applicable laws and regulations within the territories

of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party.”).

As the Supreme Court has explained in detail, the purpose and function of these FNC company provisions was not to prevent veil-piercing where appropriate, but rather simply to ensure that companies registered in one state would be **recognized as legal persons** in the other state:

> The Friendship, Commerce and Navigation Treaty between Japan and the United States is but one of a series of similar commercial agreements negotiated after World War II. **The primary purpose of the corporation provisions of the Treaties was to give corporations of each signatory legal status in the territory of the other party, and to allow them to conduct business in the other country on a comparable basis with domestic firms**. Although the United States negotiated commercial treaties as early as 1778, and thereafter throughout the 19th century and early 20th century, these early commercial treaties were primarily concerned with the trade and shipping rights of individuals. **Until the 20th century, international commerce was much more an individual than a corporate affair**.
>
> As corporate involvement in international trade expanded in this century, old commercial treaties became outmoded. Because “corporation[s] can have no legal existence out of the boundaries of the sovereignty by which [they are] created,” *Bank of Augusta v. Earle*, 13 Pet. (38 U.S.) 519, 588, 10 L.Ed. 274 (1839), it became necessary to negotiate new treaties granting corporations legal status and the right to function abroad. A series of Treaties negotiated before World War II gave corporations legal status and access to foreign courts, but it was not until the postwar Friendship, Commerce and Navigation Treaties that United States corporations gained the right to conduct business in other countries. **The purpose of the Treaties was not to give foreign corporations greater rights than domestic companies, but instead to assure them the right to conduct business on an equal basis without suffering discrimination based on their alienage**.

*Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185-188 (1982) (emphasis added) (footnotes omitted).

Thus, Article III(1) of our Treaty of Amity with Iran – and the parallel provisions in the other FNC treaties cited above – have nothing whatsoever to do with veil-piercing, and are intended merely "to give corporations of each signatory legal status in the territory of the other party, and to allow them to conduct business in the other country on a comparable basis with domestic firms." *Sumitomo*, 457 U.S. at 186. Needless to say, domestic firms are subject to having their corporate veils pierced in United States courts, where appropriate under governing case law or statute. Therefore, the corporate veils of companies registered in Iran (and in any of the other foreign states party to FNC treaties with the United States) can also be pierced, and nothing in any Treaty of Amity provides to the contrary.

Furthermore, Bank Melli's argument is collapsed by the very language of Article III(1), which defines "companies" as including "corporations, partnerships, companies and other associations, whether or not with limited liability …" *Id*. By including partnerships and entities without limited liability – *i.e.* entities which in many jurisdictions lack a "corporate veil" shielding the owners from the liability of the entity and vice versa – this definition makes clear that Article III(1) has nothing to do with, much less operates to bar, veil-piercing.

Finally, we note that if Bank Melli's theory were correct, the result would be that the courts of the United States would be prohibited from ***ever*** piercing the corporate veils of ***any*** company registered in Japan, Germany, Korea, France, Israel, the Netherlands, Pakistan, Greece or any of the other numerous foreign states party to an FNC Treaty containing a provision substantively similar to Article III(1) of the FNC Treaty with Iran. Plainly, such an outcome would not only be absurd and unprecedented, but would render foreign corporations and their owners free to abuse the corporate form in the United States to the detriment of American

suppliers, creditors and investors, which in turn would wreak severe havoc with commerce between the United States and those countries.

In sum, Bank Melli's fanciful interpretation of Article III(1) should be rejected.

## III. GRANTING THE RELIEF SOUGHT WOULD NOT CONSTITUTE A "TAKING" UNDER THE CONSTITUTION

Bank Melli also argues that a "court-ordered attachment and sale of the Property also will constitute a taking in violation of … the U.S. Constitution." Melli Memo at 16-20. As shown below, this argument is meritless for numerous reasons.

### A. Bank Melli's Property Was Rendered Subject to Execution by Exercise of Presidential Emergency Powers as the Result of Bank Melli's Unlawful Actions Threatening U.S. National Security

Section 201 of TRIA, which renders the blocked assets of agencies and instrumentalities of Iran, like Bank Melli, subject to attachment and execution in satisfaction of terrorism judgments against Iran, was enacted in November 2002. At that time, Bank Melli's assets were not blocked and so were not subject to execution under § 201 of TRIA. *Weinstein v. Islamic Republic of Iran*, 299 F.Supp.2d 63 (E.D.N.Y. 2004) (finding that Bank Melli's assets are not blocked and are therefore not subject to execution under TRIA).

Subsequently, Bank Melli chose to assist Iran to build its nuclear weapons program and carry out terrorism, as the Department of the Treasury expressly found:

> Bank Melli provides banking services to entities involved in Iran's nuclear and ballistic missile programs, including entities listed by the U.N. for their involvement in those programs … Through its role as a financial conduit, Bank Melli has facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs. In doing so, Bank Melli has provided a range of

> financial services on behalf of Iran's nuclear and missile industries, including opening letters of credit and maintaining accounts.
>
> Bank Melli also provides banking services to the [Islamic Revolutionary Guard Corps] and the Qods Force.[1] Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system.

Department of the Treasury publication, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, October 25, 2007 (Exhibit A).

As a result of this conduct, Bank Melli was designated as a proliferator of weapons of mass destruction under Executive Order 13382. *See* Exhibit A. Executive Order 13382, which was issued under the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq*.) (IEEPA), blocks the property of designated proliferators of weapons of mass destruction, was issued in light of "the national emergency described and declared in Executive Order 12938 of November 14, 1994, regarding the proliferation of weapons of mass destruction and the means of delivering them." 70 F.R. 38567, July 1, 2005.

Upon issuing Executive Order 12938 pursuant to IEEPA, President Clinton stated:

> I … find that the proliferation of nuclear, biological, and chemical weapons ("weapons of mass destruction") and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and hereby declare a national emergency to deal with that threat.

59 F.R. 59099; November 16, 1994.

---

[1] The IRGC and the Qods Force are involved in both nuclear weapons proliferation and terrorism. *See* Exhibit A.

Thus, Bank Melli's assets were blocked – and thereby rendered subject to execution in satisfaction of terrorism judgments against Iran under TRIA – only because Bank Melli elected of its own free will to engage in conduct which constitutes "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." 59 F.R. 59099.

It is well established that the deprivation of property in such circumstances does not constitute a "taking" within the meaning of the Fifth Amendment. The decision in *Paradissiotis v. U.S.*, 304 F.3d 1271 (Fed. Cir. 2002) is exactly on point. Paradissiotis was a Cypriot national closely affiliated with the government of Libya. As a result of that affiliation, Paradissiotis was designated by the Treasury as a Specially Designated National under the Libyan Sanctions Regulations. "The legal effect of that designation was to treat Mr. Paradissiotis as an agent of the government of Libya and to require that his assets within the United States be frozen." *Paradissiotis*, 304 F.3d. at 1273.

Among Paradissiotis' frozen assets in the United States were stock options in a Delaware corporation. As the result of the Treasury blocking order Paradissiotis was unable to exercise or sell his stock options, which then expired and became worthless. Paradissiotis brought suit in the Court of Claims against the United States, asserting that the ***permanent*** loss of his rights to the stock options caused by the government's conduct constituted an unconstitutional "taking." The Court of Claims rejected this argument and the Federal Circuit affirmed:

> On several occasions, this court has addressed Fifth Amendment takings claims raised by persons or entities that have been adversely affected by actions taken for national security reasons to freeze the assets of, or prohibit transactions by, foreign entities, and on each occasion we have held that the actions have not violated the Takings Clause. With specific reference to the Libyan Sanctions Regulations, we have held that those regulations **substantially advance the national security of the United States** and that the frustration of contract rights resulting from the application of those regulations does not constitute a Fifth

> Amendment taking. *Chang v. United States*, 859 F.2d 893, 896-97 (Fed.Cir. 1988); *see also 767 Third Ave. Assocs. v. United States,* 48 F.3d 1575, 1581 (Fed.Cir. 1995).
>
> The principle underlying those decisions was articulated by the Supreme Court in the *Legal Tender Cases (Knox v. Lee),* 79 U.S. (12 Wall.) 457, 551, 20 L.Ed. 287 (1870), where the Court explained:
>
>> A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? ... [W]as it ever imagined this was taking private property without compensation or without due process of law?
>
> While takings law has changed significantly since those words were written, the language used by the Supreme Court has often been quoted, and the principle remains sound … As applied to economic sanctions such as orders blocking transactions and freezing assets, that principle disposes of any suggestion that the United States could freeze Libyan assets in this country only if it were prepared to pay the cost of any losses resulting from the freeze. **Economic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be compensated for the losses those sanctions caused them**.

*Paradissiotis*, 304 F.3d. at 1274-5 (emphasis added).

Critically for the instant case, the Federal Circuit also noted that Paradissiotis' loss of the stock options was the entirely foreseeable result of his own voluntary conduct:

> Mr. Paradissiotis's stock options were in no jeopardy until 1990, when he took the step that ultimately resulted in his loss-serving as a director of a Libyan-controlled corporation. At that time, the consequences of his conduct were entirely foreseeable. The Libyan Sanctions Regulations had been in effect for four years, it was clear that his position made him subject to those regulations, and it was clear that exercising his stock options would be a prohibited transaction under the regulations. The pertinent date for considering Mr. Paradissiotis's expectations was 1990, when he took the step that subjected him to regulations that otherwise would have had no effect on him. As of that date, he had clear

> notice of what the consequences of his actions would be. *See Meriden Trust & Safe Deposit Co. v. Fed. Deposit Ins. Corp.*, 62 F.3d 449, 455 (2d Cir. 1995) (because the plaintiff bank chose to maintain its insured status, "voluntarily subjecting itself to a known obligation, .... no unconstitutional taking occurred"). Mr. Paradissiotis took the risk – a big risk, in light of the high visibility of the Libyan sanctions regime – that his involvement with a Libyan-controlled corporation would result in loss of access to his United States assets. The fact that his risk-taking turned out badly for him does not render it a taking in violation of the Fifth Amendment.

*Paradissiotis*, 304 F.3d. at 1276.

Precisely so here: Bank Melli's property in the United States was placed in jeopardy only because the bank itself acted to proliferate nuclear weapons, which in turn lead to its designation and the blocking of its assets. Like Mr. Paradissiotis, Bank Melli had "clear notice of what the consequences of [its] actions would be" – *i.e.*, designation and the blocking of its assets, which *per se* subjected them to execution under TRIA. Indeed, since the passage of TRIA in 2002, one of the risks and consequences ***inherent*** in a designation under IEEPA is that the designated entity's assets will become subject to execution under TRIA. Bank Melli knows this better than most, since it was involved in TRIA litigation before this very Court from virtually the moment TRIA was passed. *Weinstein*, 299 F.Supp.2d 63.

In sum, Bank Melli "took the risk – a big risk, in light of the high visibility of the [Iranian] sanctions regime – that [its] involvement with" Iran's nuclear weapons program "would result in loss of access to [its] United States assets. The fact that [its] risk-taking turned out badly for [Bank Melli] does not render it a taking in violation of the Fifth Amendment." *Paradissiotis*, 304 F.3d. at 1276.

Finally, *Paradissiotis*' conclusion that voluntary conduct cannot give rise to a "takings" claim holds true even where, unlike here, the challenged governmental action is entirely ***unrelated*** to national security:

> The government does not force plaintiffs to grow raisins or to market the raisins; rather, it directs that *if* they grow and market raisins, then passing title to their "reserve tonnage" raisins to the RAC [Raisin Administrative Committee] is their admission ticket. …
>
> **However harsh the consequences of the raisin marketing order, the consequences attendant to marketing raisins were known in advance**. Although the transfer of title to the reserve raisins to the RAC cannot be considered as "voluntary" in the sense that it was a desired outcome of intended action, neither was it an unexpected result of such action.

*Evans v. U.S.*, 74 Fed.Cl. 554, 564, n. 16 (Fed.Cl. 2006); *Garelick v Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993) ("where a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking"); *Meriden Trust & Safe Deposit v. FDIC.*, 62 F.3d 449, 455 (2d Cir. 1995) (citing cases holding that deprivation of property resulting from voluntary conduct cannot constitute a "taking" and finding that bank's cross-guarantee liability for losses of commonly controlled institution did not constitute a taking, where bank voluntarily chose to maintain FDIC insurance and could thus reasonably expect to be subject to liability); *Brace v. U.S.*, 72 Fed.Cl. 337, 360, n. 36, 37 (Fed.Cl. 2006) (same and citing cases).

Clearly, no one forced Bank Melli to become a proliferator of weapons of mass destruction, and its decision to do so was purely voluntary. Moreover, unlike selling raisins and maintaining FDIC insurance, Bank Melli's conduct was unlawful, dangerous and a threat to U.S. national security. Thus, Bank Melli assumed the risk that its repugnant conduct would result in

its designation under IEEPA, the blocking of its assets and the automatic rendering of those assets subject to execution under TRIA.

Therefore, Bank Melli cannot now complain of a "taking".

### **B. Liability-Shifting Statutes Such As TRIA Cannot Give Rise to a "Takings" Claim**

Additionally and/or alternatively, granting the relief sought here would not constitute a "taking," because TRIA is a merely a liability-shifting statute of a type repeatedly found constitutional. As discussed above, § 201 of TRIA is a simply a statutory veil-piercing provision that renders agencies and instrumentalities of foreign state sponsors of terrorism liable for terrorism judgments entered against such states.

Congress has enacted similar provisions which shift liability from one party to a related party, and the federal courts have consistently held that such statutes do not constitute a "taking."

For example, the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") provides that when bank failure causes loss to federal bank insurance fund, sister banks owned by same bank holding company may be held liable for loss. The courts have uniformly held that these provisions do not result in prohibited taking of property under Fifth Amendment. *See e.g. Branch v. U.S.,* 69 F.3d 1571 (Fed.Cir. 1995); *Meriden Trust and Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449 (2d. Cir. 1995).

Moreover, as the Federal Circuit explained in *Branch*:

> FIRREA is not the only federal statute that **overrides the principle of limited corporate liability in some circumstances. [ERISA] contains an exception to the rule of limited corporate liability that is virtually identical to the cross-guarantee provision of FIRREA**. In imposing liability on employers upon withdrawing from multiemployer pension plans or upon the termination of pension plans, Congress provided that liability

> would extend not only to the particular employer that belonged to the pension plan, but also to any related entities under "common control." *See* 29 U.S.C. §§ 1301(b), 1362, 1364, 1381 … **Although the "common control" provision of ERISA has been challenged under the Takings Clause, the challenges have been uniformly rejected**. *See Central States, Southeast & Southwest Areas Pension Fund v. Skyland Leasing Co.*, 691 F.Supp. 6, 15 (W.D.Mich. 1987), *aff'd mem.*, 892 F.2d 1043 (6th Cir. 1990); *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 636 F.Supp. 641, 663-66 (N.D.Ill. 1986); *Lyons v. Raymond Rosen & Co.*, 18 Employee Benefits Cas. 1037, 1051-53, 1994 WL 129955 (E.D.Pa. 1994).

*Branch v. U.S.*, 69 F.3d at 1582.

Like FIRREA and ERISA, § 201 of TRIA extends liability between closely-related entities to accomplish a legitimate and important legislative purpose, and thus a grant of relief under § 201 -- like the application of the veil-piercing provisions of FIRREA and ERISA -- cannot constitute a "taking."

### C. Compensation Is Provided by a Reduction Iran's Judgment Debt

Additionally and/or alternatively, relief under § 201 TRIA is not a forbidden "taking" for the simple and obvious reason that Iran's judgment debt will be reduced by an amount equal to the sale value of the property. It is well established that compensation need not be in cash, and may be made in a form set by the legislature. *See e.g. In re Penn Central Transp. Co.*, 382 F.Supp. 856 (E.D.Pa. 1974) (Compensation may be made in cash or equivalent); *Blanchette v. Connecticut General Ins. Corporations*, 419 U.S. 102 (1974) (Nothing prevents legislature, rather than courts, from specifying form of compensation to be made for taking of property); *U.S. v. 45.50 Acres of Land, More or Less, Situate in Henry County, State of Mo.*, 634 F.2d 405 (8th Cir. 1980) (Fifth Amendment does not guarantee that compensation be meted out in way more convenient to property owner than to sovereign.); *U.S. ex rel. Tenn. Valley Authority v. Indian Creek Marble Co.*, 40 F.Supp. 811 (E.D.Tenn. 1941) (Fifth Amendment has no reference

to the form in which compensation shall be paid, whether in cash or in benefits incident to the use to which the property taken is put by the condemnor).

Because Iran's judgment debt will be reduced simultaneously with the sale of the property in an amount identical with the sale price, Iran will receive full compensation (assuming, *arguendo*, that the sale of the property constituted a taking in the first place, which it does not).

Bank Melli will likely argue that because Iran, and not the bank, is receiving the benefit of the reduction of the judgment debt, that reduction does not qualify as compensation under the Fifth Amendment. The Court should reject any such argument for two reasons:

First, as a wholly-owned agency of the government of Iran, Bank Melli is presumably entitled under Iranian law to seek and receive indemnification from Iran for the sale value of the property (which will equal the amount of the reduction in Iran's judgment debt). Notably, it was Bank Melli's burden to demonstrate that it *cannot* seek such indemnification. *Urban Developers LLC v. City of Jackson, Miss.*, 468 F.3d 281 (5th Cir. 2006) ("the property owner bears the burden of proving that state law proceedings are unavailable or inadequate."). Since Bank Melli has failed to assert much less show that it cannot obtain such compensation from Iran, the Court should summarily reject the bank's takings claim.

Second, under the Supreme Court's decision in *Bancec*, a reduction in Iran's judgment debt can and should be considered payment of compensation to an agency or instrumentality of Iran, for purposes of the Takings Clause.

In *Bancec* the Supreme Court held that the separate legal status of a foreign state agency would not be recognized "when to do so would work … injustice." *Bancec*, 462 U.S. 611 at 629 (quotations omitted). Here, Congress has specifically authorized American victims of Iranian-sponsored terrorist attacks to enforce unpaid judgments against Iran against agencies of Iran such

as Bank Melli. It would therefore "work … injustice" to regard the reduction of Iran's judgment debt as not redounding to Bank Melli's benefit, and as not constituting compensation to Bank Melli under the Fifth Amendment, simply because of Bank Melli's formal status as a separate entity. Rather, the corporate form should be disregarded in the interest of justice, as permitted by *Bancec*, and the compensation afforded Iran via the reduction of its judgment debt should be considered compensation paid to Bank Melli itself.

## IV. GRANTING THE RELIEF SOUGHT WOULD NOT CONSTITUTE A "TAKING" UNDER THE TREATY OF AMITY

Bank Melli also claims that granting the relief sought here would violate Article IV(2) of the Treaty of Amity, which provides that "Property of nationals and companies of either High Contracting Party … shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation." Melli Memo at 16-20.

This argument fails for all the reasons set forth above regarding Bank Melli's Fifth Amendment "takings" claim, and for the following additional reasons:

First, Article IV(2) is meant to bar the uncompensated nationalization or expropriation of property by the **government**, not a case where, as here, property is taken by a private party to satisfy a judgment debt. The identical or nearly identical provision appears in at least a dozen other FNC Treaties, and is clearly intended to bar **governmental** expropriation. *See Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia*, 729 F.2d 422, 426 (6th Cir. 1984) ("The 1953 United States-Ethiopia Treaty of Amity and Economic Relations is one of a series of treaties, also known as the FCN Treaties, between the United States and foreign nations negotiated after World War II … Almost all of these treaties contain sections which provide for 'prompt, adequate, and effective compensation', 'just compensation', or

similar language regarding compensation for expropriated property.”). *See also id*. at 428 (listing treaty provisions which use the terms “taken” and “expropriated” interchangeably); *American Intern. Group, Inc. v. Islamic Republic of Iran*, 493 F.Supp. 522 (D.D.C. 1980) (treating Article IV(2) as prohibiting nationalization); *McKesson Corp. v. Islamic Republic of Iran*, 1997 WL 361177 (D.D.C. 1997) (same); *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101 (D.C. Cir. 2001) (same).

Indeed, the Amicus Brief of the United States in the *McKesson* case (helpfully submitted by Bank Melli as Exhibit C to its memorandum) explains that Article IV is intended to ensure “payment of just compensation when property of one country’s nationals is taken **by the other government**.” *Id*. at 3 (emphasis added).

Thus, the instant proceeding is simply not within the ambit of Article IV.[2]

Second, if Article IV(2) prohibited veil-piercing as a "taking", as Bank Melli claims, that would mean that U.S. courts are barred from piercing the corporate veils of corporations registered in any of the many other foreign states party to FNC Treaties containing similar provisions. *See Kalamazoo*, 729 F.2d at 428 (listing similar provisions in numerous FNC Treaties). Clearly, such a conclusion would be baseless and unprecedented.

Finally, Bank Melli’s argument that veil-piercing is prohibited under international law – and therefore by the Treaty of Amity – is completely meritless. The Supreme Court expressly noted in *Bancec* that “courts in the United States **and abroad**, have recognized that an

[2] But even if Article IV applies to an action by a private party there is still no bar to relief, for all the reasons set forth above in respect to the Fifth Amendment claim. Indeed, Bank Melli itself treats the “takings” issue as identical under both the Treaty and the Constitution. Melli Memo at 16-20.

incorporated entity … is not to be regarded as legally separate from its owners in all circumstances." *Id*. at 630 (emphasis added) (footnote omitted). In support of this conclusion, the Supreme Court cited and quoted at length a decision of the International Court of Justice:

> In *Case Concerning The Barcelona Traction, Light & Power Co.*, 1970 I.C.J. 3, **the International Court of Justice acknowledged that, as a matter of international law, the separate status of an incorporated entity may be disregarded in certain exceptional circumstances**:
>
> > " … [T]he law has recognized that the independent existence of the legal entity cannot be treated as an absolute. It is in this context that the process of 'lifting the corporate veil' or 'disregarding the legal entity' has been found justified and equitable in certain circumstances or for certain purposes. The wealth of practice already accumulated on the subject in municipal law indicates that the veil is lifted, for instance, to prevent misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance, to protect third persons such as a creditor or purchaser, or to prevent the evasion of legal requirements or of obligations.
> >
> > * * *
> >
> > In accordance with the principle expounded above, the process of lifting the veil, being an exceptional one admitted by municipal law in respect of an institution of its own making, **is equally admissible to play a similar role in international law**...." *Id.,* at 38-39.

*Bancec* at 630 n. 20 (emphasis added).

Section 201 of TRIA thus fully comports with international law, and Bank Melli's claim to the contrary is baseless.

## V. THE RELIEF SOUGHT WOULD NOT VIOLATE ARTICLES IV(1), IV(4) OR V(1) OF THE TREATY OF AMITY

Bank Melli next claims that the relief sought here would "Quite clearly" violate Articles IV(1), IV(4) and V(5) of the Treaty of Amity, which require the United States to treat Iranian

companies fairly, equitable and on no worse terms than enjoyed by domestic corporations.

The bank does not, however, explain why this is "Quite clearly" so, since it cannot: American corporations are subject to reverse veil-piercing every day of the week, and Bank Melli therefore has nothing to complain about.

Furthermore, Bank Melli's galling complaint about purportedly discriminatory and unequal treatment ignores the fact that its current predicament is nothing but the fruit of its own unlawful conduct in assisting Iran's nuclear weapons program and threatening U.S. national security. If a domestic corporation acted as Bank Melli did it would quickly find itself shut down, its assets forfeited and its directors locked away in a federal prison. If anything, Bank Melli is getting off easy, and enjoying favorable discrimination. Notably, a similar argument about "unequal treatment" (under the UN Charter) was recently raised by Syria, and rejected by the D.C. Circuit as unworthy even of an opinion. *Wyatt v. Syrian Arab Republic*, 2008 WL 441828 (D.C. Cir. 2008) ("even if Article 2(1) [of the UN Charter] does demand strict equality across states, the provisions are not in conflict because § 1605(a)(7) does not treat Syria (and the other terrorism sponsor states) unequally. Any country can come within § 1605(a)(7)'s exception so long as the Secretary of State designates it a terrorism sponsor.")

## VI. THE ALGIERS ACCORDS DO NOT PRECLUDE THE RELIEF SOUGHT

Bank Melli's final argument is that the United States' blocking of its property violated the Algiers Accords, and that allowing plaintiffs to satisfy their judgment from that property would further violate the Accords. Melli Memo 21-23.

This argument is meritless. In the first place, the Algiers Accords do not even apply to real property. *See* Declaration of the Government of the Democratic and Popular Republic of

Algeria (General Declaration), 19 January 1981 at ¶¶ 4-9 (requiring that moveable property only be transferred to Iran).

Second, even assuming *arguendo* that real property was covered in the Accords, the United States had a **one-time obligation** under the Algiers Accords "to ensure the mobility and free transfer of all Iranian assets within its jurisdiction" and to "arrange … for the transfer to Iran of all Iranian properties which are located in the United States." The United States fulfilled that obligation 27 years ago, in 1981, by issuing a series of executive orders and regulations releasing all restraints on Iranian property in the United States, and directing U.S. citizens to surrender Iranian property in their possession to Iran. *See generally Dames & Moore v. Regan,* 453 U.S. 654 (U.S. 1981).

Thus, since 1981 and until 2007, Bank Melli was free to use and dispose of its property in the United States, including the Forest Hills residence, as it saw fit. Indeed, the State Department's Terrorist Asset Report for 2006 specifically notes that "Bank Melli, owns residential real estate in Forest Hills, New York. The property **is not blocked**." Exhibit B at 13 (emphasis added).

Clearly, then, the United States fulfilled its one-off obligation under the Algiers Accords decades ago. Nothing in the Algiers Accords even faintly suggests that once the United States had released Iranian property in 1981, it was prohibited from **subsequently** imposing new blocking sanctions on Iranian property in response to **later** misconduct by Iran.

Bank Melli's claim that because the Algiers Accords remain in force, the United States has an on-going, continuing obligation to prevent any future interference with Iranian property is ludicrous. A treaty, like a contract, can remain in force for years or decades, but that does not mean that all the obligations contained therein are continuous. Imagine, for example, that one of the former embassy hostages returned to Iran and robbed a bank. Would the United States be

entitled to demand that Iran release the former hostage on the grounds that Algiers Accords required Iran to release that person in 1981 and that obligation is on-going since the Accords are still in force? Hardly.

And that it precisely what happened here: **subsequent** to the United States' release of all Iranian assets including Bank Melli's property – *i.e.* long **after** the United States had fulfilled its obligation in 1981 – Bank Melli (along with a slew of other Iranian agencies and instrumentalities – *see* Exhibit A) provided support for nuclear weapons proliferation which threatens our national security. In response to this post-1981 conduct, the United States blocked the assets of Bank Melli and the other Iranian agencies involved.

In essence, Bank Melli is claiming that in the 1981 Algiers Accords the United States agreed to immunize all Iranian assets for all time, and that Iran and its agencies are therefore free to threaten U.S. national security while the United States remains impotent, forbidden under the Accords from ever blocking Iranian assets in response. This argument is offensive nonsense.

Bank Melli is obviously fishing for a ruling holding that the United States violated the Algiers Accords by blocking its property, which it can then use against the United States in the Iran-U.S. Claims Tribunal or some other foreign forum. The Court should not take the bait.

## VII. ALTERNATIVELY, TRIA § 201 OVERRIDES THE TREATY OF AMITY AND THE ALGIERS ACCORDS

In the alternative, *i.e.* in the event (which plaintiff respectfully believes to be unlikely) that the Court finds that the relief sought here would in some manner violate the Treaty of Amity and/or the Algiers Accords, the Court should find that § 201 of TRIA overrides those treaties.

TRIA permits the plaintiffs to execute their judgment against the Forest Hills house "Notwithstanding any other provision of law …" *Id*. at §201(a). Thus, Congress clearly and

expressly determined that § 201 TRIA will override any "law" which would otherwise preclude the relief granted by TRIA.

There can be no question that a treaty is a "law." It is fundamental that treaties are the "supreme law of the land" U.S. Const. Art. VI, sec. 2. A treaty is "to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision." *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10 (1936).

Accordingly, by its own terms, relief is available under TRIA § 201 notwithstanding any contrary provisions of law – including any treaties. *See e.g. Washington State Charterboat Ass'n v. Baldrige*, 702 F.2d 820, 823 (9th Cir. 1983) (holding that the phrase "any other applicable law" appearing in the Magnuson Act includes treaties).[3] *Gorton v. American Cyanamid Co.*, 533 N.W.2d 746, 751 (Wis. 1995) ("Obviously, federal law includes the United States Constitution and all of the federal statutes and treaties promulgated by Congress.").

Indeed, in *Hill v. Republic of Iraq*, 2003 WL 21057173 (D.D.C. 2003), the court expressly found that TRIA's "notwithstanding" language overrides both statutes **and treaties**:

> Section 201 of the TRIA states that "[n]otwithstanding any other provision of law," the blocked assets of a terrorist party "shall be subject to execution or attachment in aid of execution." **As this Court has frequently recognized, "the phrase 'notwithstanding any other provision of law,' or a variation thereof, means exactly that; it is unambiguous and effectively supersedes all previous laws."** *Energy Transp. Group, Inc v.*

[3] While the treaties at issue in *Baldrige* happened to be treaties with Indian nations, it is well-established that Indian treaties "are entitled to the same respect as treaties made with foreign nations" and are "the supreme Law of the Land" under Article VI of the Constitution. *Oneida Indian Nation of New York v. State of N.Y.*, 860 F.2d 1145, 1155 (2d. Cir. 1988).

> *Skinner*, 752 F.Supp. 1, 10 (D.D.C. 1990); *see also Crowley Caribbean Transp., Inc. v. United States*, 865 F.2d 1281, 1283 (D.C.Cir. 1989) **("[a] clearer statement [than 'notwithstanding any other provision of law'] is difficult to imagine**"). Accordingly, by its plain terms, **the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention [on Diplomatic Relations]** or the FSIA.

*Id*. at *1-2.

Such a conclusion also squares with the legislative history of TRIA § 201, which clearly shows that § 201 is a remedial statute specially aimed at assisting U.S. victims of terrorist attacks sponsored by Iran. *See* 148 CONG. REC. S11526 -- S11528 (second session, November 19, 2002) (repeated references to compensating victims of Iranian sponsored terrorism).

In light of this clear Congressional purpose it is absurd to argue, as Bank Melli does, that Congress did not intend TRIA's "Notwithstanding" language to apply to treaties, and thereby left American victims of Iranian-sponsored terrorist attacks, such as the plaintiffs herein, with no remedy under TRIA against property owned by agencies and instrumentalities of Iran (assuming, purely *arguendo*, that the Treaty of Amity and Algiers Accords prohibited the relief granted under TRIA, which they do not).

Bank Melli has cited several cases holding that Congress' intent to override a treaty should not be inferred, but those cases are entirely inapposite, because they dealt with statutes that did not contain "notwithstanding" provisions.

Accordingly, if the Court finds that the Treaty of Amity or the Algiers Accords bar the relief sought here, it should hold that they are overridden by TRIA § 201.

## VIII. CONCLUSION

Bank Melli's motion should be denied and plaintiff's motion should be granted.

Dated: New York, New York
May 27, 2008

Respectfully submitted,

JAROSLAWICZ & JAROS, LLC
*Attorneys for the plaintiff Jennifer Weinstein Hazi*

by: ___________________________
Robert Tolchin

225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780