UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
SUSAN WEINSTEIN, individually, as co-administrator of the Estate of Ira William Weinstein, and as natural guardian of plaintiff David Weinstein, et al.,

Plaintiffs-Judgment Creditors,

-against-

THE ISLAMIC REPUBLIC OF IRAN, et al.,

Defendants-Judgment Debtors.
-----------------------------------------------------------x

MEMORANDUM AND ORDER

Misc. 02-237

APPEARANCES

JAROSLAWICZ & JAROS, LLC
BY: ROBERT TOLCHIN, ESQ.
Attorneys for Plaintiffs-Judgment Creditors
225 Broadway, 24th Floor
New York, NY 10007

BERLINER, CORCORAN & ROWE, L.L.P.
BY: THOMAS G. CORCORAN and LAINA C. WILK, ESQS.
Attorneys for Defendants-Judgment Debtors
1101 Seventeenth Street, N.W.
Washington, D.C. 20036

ROSEN GREENBERG BLAHA, LLP
BY: JOHN N. ROMANS, ESQ.
Attorneys for Defendants-Judgment Debtors
40 Wall Street, 32nd Floor
New York, NY 10005

WEXLER, District Judge

Plaintiffs-judgment creditors ("plaintiffs") move for the appointment of a receiver pursuant to Federal Rule of Civil Procedure ("FRCP") 69 and New York Civil Practice Law & Rules ("CPLR") § 5228(a) to sell property located at 135 Puritan Avenue, Forest Hills, New York (the "Property") owned by Bank Melli to satisfy their judgment in the underlying action

against defendants-judgment debtors the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information, and three senior Iranian officials. Plaintiffs assert that the Property is subject to attachment under the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322, 28 U.S.C. § 1610 note. Bank Melli moves to dismiss this proceeding and to stay the appointment of a receiver pending resolution of its motion to dismiss. Plaintiffs oppose Bank Melli's motion to dismiss.[1] The Court, having granted Bank Melli's motion to stay, now denies Bank Melli's motion to dismiss and grants plaintiffs' motion to appoint a receiver.

## I. BACKGROUND

For purposes of this proceeding, the relevant background has been summarized sufficiently in the Court's earlier decision in Weinstein v. Islamic Republic of Iran, 299 F. Supp. 2d 63 (E.D.N.Y. 2004) ("Weinstein I"), and will not be repeated here, except as necessary to this decision. In Weinstein I, this Court held that Bank Melli's assets were not, at that time, "blocked" under §§ 202 and 203 of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, 1702, and, therefore, not subject to attachment under the TRIA. Weinstein I, 299 F. Supp. 2d at 74-75. However, as plaintiffs assert, on October 25, 2007, the United States Department of Treasury, Office of Foreign Assets Control ("OFAC") designated Bank Melli as a proliferator of weapons of mass destruction under Executive Order 13,382. See Exec. Order 13,382, 70 Fed. Reg. 38,567 (June 28, 2005). Executive Order 13,382, which the President issued pursuant to the IEEPA, provides that "all property and interests in property" of

---

[1]By letter (docket number 72), plaintiffs seek leave to submit a one-page surreply, purportedly to correct a misstatement in Bank Melli's reply papers. The request is granted. In addition, the Court notes that the United States Department of Justice has declined to make a submission on the issues raised by the parties, despite an invitation from the Court.

persons listed in the order or subsequently designated by the Treasury Department "that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in." Id. (emphasis added). As a result of Bank Melli's designation, according to plaintiffs, the Property is blocked and subject to attachment under the TRIA, which authorizes attachment of the "blocked assets" of not only a terrorist party, such as Iran, but the assets of its agencies and instrumentalities, such as Bank Melli. In this respect, TRIA § 201(a) provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), 116 Stat. at 2337 (emphasis added). Thus, plaintiffs claim, they are entitled to enforce their judgment against the Property because the Property is a "blocked asset" under the TRIA and Bank Melli is an "agency or instrumentality" of Iran.

Although Bank Melli concedes that the Property is a "blocked asset" under the TRIA and that Bank Melli is an "agency or instrumentality" of Iran, it argues: (1) that the attachment and sale of the Property would violate the "Treaty of Amity" between the United States and Iran, see Treaty of Amity, Economic Relations, and Consular Rights, U.S.-Iran, Aug. 15, 1955, 8 U.S.T. 899, T.I.A.S. No. 3853, 1957 WL 52887 ("Treaty of Amity"); (2) that the attachment and sale would constitute a "taking" not for public purpose and without just compensation in violation of

the Treaty of Amity and the Fifth Amendment of the United States Constitution; (3) that the Treasury Department's blocking of Bank Melli's assets, including the Property, violates the "Algiers Accords," see Declaration of the Government of the Democratic and Popular Republic of Algeria, Jan. 19, 1981, reprinted in 20 I.L.M. 224 (1981) ("Algiers Accords"); and (4) that a Court order permitting the attachment and sale would put the United States in further breach of the Algiers Accords.

## II. DISCUSSION

### A. Bank Melli's Motion to Dismiss

#### 1. Treaty of Amity Article III(1)

Bank Melli argues that the attachment and sale of the Property would violate Article III(1) of the Treaty of Amity, which provides:

> Companies constituted under the applicable laws and regulations of either High Contracting Party shall have their juridical status recognized within the territories of the other High Contracting Party. It is understood, however, that recognition of juridical status does not of itself confer rights upon companies to engage in the activities for which they are organized. As used in the present Treaty, 'companies' means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit.

Treaty of Amity art. III(1). According to Bank Melli, the Treaty of Amity "adopts an established principle of customary international law," namely, that the separate juridical status of an Iranian company must be respected. Memorandum of Law in Support of Bank Melli's Motion to Dismiss ("Bank Melli Mem."), at 15. In Bank Melli's view, this principle prohibits the statutory veil-piercing authorized by TRIA § 201(a). This "presumption of separateness," according to

Bank Melli, may only be overcome under circumstances specified in First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983) ("Bancec"). Under Bancec, to pierce the corporate veil distinguishing a foreign state and from its agencies and instrumentalities, a judgment-holder must show that the agency or instrumentality is "so extensively controlled by [the foreign state] that a relationship of principal and agent is created" or that recognizing the entity as separate "would work fraud or injustice." See id. In other words, under Bancec, plaintiffs cannot recover on their judgment against defendants by executing on Bank Melli's blocked assets unless they overcome the presumption that treats Iran's agencies and instrumentalities as entities juridically separate from Iran.

Plaintiffs argue that the veil piercing authorized by TRIA § 201(a) obviates application of Bancec and does not violate the Treaty of Amity. This Court agrees. Neither the language nor purpose of Article III(1) of the Treaty of Amity supports Bank Melli's position. As Bank Melli points out, the Treaty of Amity between Iran and the United States is one of a number of friendship, commerce, and navigation ("FCN") treaties negotiated by the United States following WWII. Bank Melli Mem. at 3. As plaintiffs point out, "most if not all of these FCN treaties contain [corporation] provisions substantively identical to Article III(1)." Plaintiff-Judgment Creditor's Memorandum in Opposition to Bank Melli's Motion to Dismiss and Reply in Further Support of Motion for Appointment of a Receiver Pursuant to CPLR § 5228(a), at 7-9 (citing treaties). As the Supreme Court has recognized, "the primary purpose of the corporation provisions of the Treaties was to give corporations of each signatory legal status in the territory of the other party, and to allow them to conduct business in the other country on a comparable basis with domestic firms." Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 185-86

(1982). Indeed, "the purpose of the Treaties was not to give foreign corporations greater rights than domestic companies, but instead to assure them the right to conduct business on an equal basis without suffering discrimination based on their alienage." Id. at 187-88. There is nothing in the language or purpose of Article III(1) of the Treaty of Amity that precludes the veil-piercing authorized by TRIA § 201(a).

In any event, to the extent that TRIA § 201(a) may conflict with Article III(1) of the Treaty of Amity, the TRIA would "trump" the Treaty of Amity. See United States v. Yousef, 327 F.3d 56, 110 (2d Cir. 2003) (recognizing Supreme Court holdings that subsequent "legislative acts trump treaty-made international law"). Indeed, the Supreme Court has held explicitly that "when a statute which is subsequent in time [to a treaty] is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null." Breard v. Greene, 523 U.S. 371, 376 (1998) (internal quotations omitted); see also Whitney v. Robertson, 124 U.S. 190, 194 (1888) (holding that if treaty and federal statute conflict, "the one last in date will control the other").

As for the applicability of Bancec, Judge Victor Marrero of the United States District Court for the Southern District of New York, in a persuasive analysis, concluded that the plain language and legislative history of TRIA § 201(a) demonstrate a clear expression to make agencies and instrumentalities substantively liable for the debts of their related foreign governments, overriding the Bancec presumption of independent status for the agencies and instrumentalities of terrorist parties. See Weininger v. Castro, 462 F. Supp. 2d 457, 484-87 (S.D.N.Y. 2006). For the same reasons, this Court concludes that TRIA § 201(a) obviates the application of Bancec to a determination of whether the blocked assets of Bank Melli

(admittedly an agency or instrumentality of a terrorist party) are available satisfy the judgment against defendants (terrorist parties). That there was no FCN treaty at issue in Weininger (Cuba does not have such treaty with the United States) is not significant, given this Court's determination that Article III(1) of the Treaty of Amity does not preclude the veil piercing authorized by TRIA § 201(a).

Accordingly, this ground for dismissal is rejected.

2. Treaty of Amity Article IV(2) and the Fifth Amendment

Bank Melli further argues that the attachment and sale would constitute a "taking" not for public purpose and without just compensation in violation of Article IV(2) of the Treaty of Amity and the Fifth Amendment of the United States Constitution. Article IV(2) of the Treaty of Amity provides, in relevant part: "Property of nationals and companies of either High Contracting Party . . . shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation." Treaty of Amity art. IV(2). The Fifth Amendment prohibits the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V.

The parties primarily dispute whether there is a "taking" for Fifth Amendment purposes. Plaintiffs rely on the decision in Paradissiotis v. United States, 304 F.3d 1271 (Fed. Cir. 2002), for their argument that there is no "taking" of Bank Melli's Property under the circumstances. In that case, the plaintiff, Paradissiotis, was a Cypriot national with close affiliations to the government of Libya. Based on those affiliations, OFAC listed him as a "Specially Designated National" under OFAC's "Libyan Sanctions Regulations." As a result of that designation, Paradissiotis was treated "as an agent of the government of Libya" and his assets within the

United States were "frozen." Id. at 1273. Among Paradissiotis's frozen assets in the United States were stock options in a Delaware corporation. Due to the blocking order, and OFAC's denial of his requests for a license to sell or exercise his stock options, Paradissiotis was unable to sell or exercise the stock options. Eventually those options expired and became worthless. Paradissiotis brought suit in the Court of Federal Claims against the United States, asserting that the freezing of his assets and the destruction of the value of his stock options was an unconstitutional "taking."[2] The Court of Federal Claims rejected this argument, and the Federal Circuit affirmed, stating:

> On several occasions, this court has addressed Fifth Amendment takings claims raised by persons or entities that have been adversely affected by actions taken for national security reasons to freeze the assets of, or prohibit transactions by, foreign entities, and on each occasion we have held that the actions have not violated the Takings Clause. With specific reference to the Libyan Sanctions Regulations, we have held that those regulations substantially advance the national security of the United States and that the frustration of contract rights resulting from the application of those regulations does not constitute a Fifth Amendment taking.
>
> The principle underlying those decisions was articulated by the Supreme Court in the *Legal Tender Cases (Knox v. Lee),* 79 U.S. (12 Wall.) 457, 551, 20 L. Ed. 287 (1870), where the Court explained:
>
>> A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff

---

[2] Paradissiotis originally brought an action in the United States District for the Southern District of Texas challenging the denial of a license to sell or exercise the options and asserting, inter alia, a Fifth Amendment takings claim. Paradissiotis, 304 F.3d. at 1273. The district court granted summary judgment dismissing his action, including his takings claim, just two days before the stock options expired. Id. The Fifth Circuit affirmed, except as to the takings claim, holding that the Court of Federal Claims had exclusive jurisdiction over that issue. Id. at 1273-74.

> could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? ... [W]as it ever imagined this was taking private property without compensation or without due process of law?
>
> While takings law has changed significantly since those words were written, the language used by the Supreme Court has often been quoted, and the principle remains sound. Thus, valid regulatory measures taken to serve substantial national security interests may adversely affect individual contract-based interests and expectations, but those effects have not been recognized as compensable takings for Fifth Amendment purposes. As applied to economic sanctions such as orders blocking transactions and freezing assets, that principle disposes of any suggestion that the United States could freeze Libyan assets in this country only if it were prepared to pay the cost of any losses resulting from the freeze. Economic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be compensated for the losses those sanctions caused them.

Paradissiotis, 304 F.3d. at 1274-75 (citations omitted).

Moreover, the Federal Circuit noted that Paradissiotis's loss of the stock options was the entirely foreseeable result of his own voluntary conduct:

> Mr. Paradissiotis's stock options were in no jeopardy until 1990, when he took the step that ultimately resulted in his loss – serving as a director of a Libyan-controlled corporation. At that time, the consequences of his conduct were entirely foreseeable. The Libyan Sanctions Regulations had been in effect for four years, it was clear that his position made him subject to those regulations, and it was clear that exercising his stock options would be a prohibited transaction under the regulations. The pertinent date for considering Mr. Paradissiotis's expectations was 1990, when he took the step that subjected him to regulations that otherwise would have had no effect on him. As of that date, he had clear notice of what the consequences of his actions would be. Mr. Paradissiotis took the risk – a big risk, in light of the high visibility of the Libyan sanctions regime – that his involvement with a Libyan-controlled corporation would result in loss of access to his United States assets. The fact that his risk-taking turned out badly

> for him does not render it a taking in violation of the Fifth Amendment.

Paradissiotis, 304 F.3d. at 1276 (citation omitted).

This Court agrees with plaintiffs that, based on the reasoning in Paradissiotis, the blocking and attachment of the Property in the circumstances presented here does not constitute a "taking" of Bank Melli's assets under the Fifth Amendment. As plaintiffs argue, Bank Melli's property in the United States was placed in jeopardy because the bank itself acted to proliferate weapons of mass destruction, which in turn lead to its designation and the blocking of its assets – a designation it does not challenge here. Like Paradissiotis, Bank Melli had "clear notice of what the consequences of [its] actions would be" – i.e., designation and the blocking of its assets, thereby subjecting its assets to execution under the TRIA. Indeed, since enactment of the TRIA in 2002, one of the risks and consequences of a designation under IEEPA is that the designated entity's assets will be subject to execution under the TRIA. Bank Melli presumably knew this well, since it was subject to TRIA litigation in this Court shortly after the TRIA was passed. See Weinstein I, 299 F. Supp. 2d 63. Bank Melli took the risks that its involvement with Iran's proliferation of weapons of mass destruction would result in the very consequences it now faces under the Iranian sanctions programs. That those consequences may have led to the attachment of its Property – a blocked asset – does not make it a taking under the Fifth Amendment. See Paradissiotis, 304 F.3d. at 1276 ("The fact that his risk-taking turned out badly for him does not render it a taking in violation of the Fifth Amendment."). For similar reasons, there is no "taking" under the Treaty of Amity.

Accordingly, this ground for dismissal is rejected.[3]

3. Algiers Accords

Bank Melli also argues that the blocking of the Property violates the Algiers Accords. As detailed in Weinstein I, on November 14, 1979, President Carter issued Executive Order 12,170 in response to Iran's seizure of the U.S. Embassy in Tehran, Iran and the resulting hostage crisis. In Executive Order 12,170, the President directed:

> I hereby order blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

Exec. Order 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979). Eventually, on January 19, 1981, the United States and Iran, through the efforts of the government of Algeria, reached an agreement, commonly known as the Algiers Accords, ending the hostage crisis. Under the Algiers Accords, the United States agreed, inter alia, to "restore the financial position of Iran, insofar as possible, to that which existed prior to November 14, 1979," and to "commit itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction." Algiers Accords, 20 I.L.M. at 224. The United States further agreed (with some exceptions) to "arrange, subject to the provisions of U.S. law applicable prior to November 14, 1979, for the transfer to Iran of all Iranian properties which are located in the United States and abroad." Id. at 227. As further detailed in Weinstein

---

[3]Bank Melli also argues that attachment and sale of the Property will violate Treaty of Amity Articles IV(1), IV(4), and V(1) by failing to treat "Iranian companies . . . in the same manner as U.S. companies, that is without discrimination and without interference into their internal affairs and property interests." Bank Melli Mem. at 20. Bank Melli offers virtually no support for this argument. Accordingly, this ground for dismissal is rejected.

I, pursuant to the Algiers Accords, most Iranian assets were unblocked. See Weinstein I, 299 F. Supp. 2d at 67-68.

According to Bank Melli, the Property has been an asset within the United States prior to November 14, 1979, making the blocking by Executive Order 13,382 a breach of the Algiers Accords. This argument is without merit. As plaintiffs argue, and as noted above, under the Algiers Accords, the United States had obligations, inter alia, to "ensure the mobility and free transfer of all Iranian assets within its jurisdiction," to "commit itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction," and to "arrange . . . for the transfer to Iran of all Iranian properties which are located in the United States and abroad." These obligations were fulfilled by the series of executive orders and regulations releasing restraints on Iranian property, presumably including the Property. See Weinstein I, 299 F. Supp. 2d at 67-68. Presumably, Bank Melli was then free to use and dispose of the Property as it saw fit, at least until the Property was blocked on October 25, 2007. Bank Melli fails to explain how the United States has violated the Algiers Accords by subsequently imposing blocking sanctions on Iranian property (including property of Iran's agencies and instrumentalities) based on subsequent Iranian conduct (including the conduct of its agencies and instrumentalities) or how an order of this Court permitting the attachment and sale would put the United States in further breach of the Algiers Accords.

Accordingly, these grounds for dismissal are rejected.

Based on the Court's rejection of the grounds raised by Bank Melli, the motion to dismiss is denied.

B. Plaintiffs' Motion to Appoint a Receiver

As for plaintiffs' motion to appoint a receiver, the Court concludes that the Property is subject to attachment under the TRIA. Accordingly, plaintiffs' motion for the appointment of a receiver is granted.

## III. CONCLUSION

For the above reasons, Bank Melli's motion to dismiss is denied and plaintiffs' motion to appoint a receiver is granted. Nevertheless, the Court stays this proceeding during the pendency of an appeal by Bank Melli, should it choose to appeal. The Clerk of Court is directed to administratively close this matter without prejudice to the right to reopen following the expiration of the time to appeal or, if an appeal is taken, upon the determination of the appeal.

SO ORDERED.

______________/s/__________________
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Date: Central Islip, New York
June 5, 2009